# AFFIDAVIT OF JASON PA

## INTRODUCTION

I, JASON PA, being duly sworn on an oath, deposes and states that:

1.      This affidavit is provided in support of the attached application for a warrant authorizing the seizure of the below mentioned bank accounts relating to money laundering violations undertaken by BETTY YI HERNANDEZ, the owner of Swing Video LLC, a Hawaii limited liability corporation located at 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814, pursuant to:

   (a)      Title 21, United States Code, Section 853, any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation.

   (b)      Title 18, United States Code, Section 982, as property real or personal, involved in such offense or any property traceable to such property, in violation of Title 18, United States Code, Section 1956 or 1957.

2.      The bank accounts to be seized and subject to forfeiture, which were proceeds involved in money laundering transactions are City Bank Account #236322420 held in the name BETTY YI HERNANDEZ, 3075 Ala Poha Place, Unit 1609, Honolulu, Hawaii 96814; First Hawaiian Bank Swing Video Checking Account #47-019753 held in the name of BETTY YI HERNANDEZ dba Swing Video, 35 North Hotel Street, Honolulu, Hawaii 96817; First Hawaiian Bank Swing Video LLC Checking Account #65-194899 held in the name of BETTY YI HERNANDEZ dba Swing Video LLC, 1340 Kapiolani Blvd., Unit 102, Honolulu, Hawaii 96814 and University of Hawaii Federal Credit Union Account #37961 held in the name of BETTY YI HERNANDEZ, 3075 Ala Poha Place, Unit 1609, Honolulu, Hawaii 96814.

3.      Section I of the Affidavit describes the experience and background of the Agent.  Section II of the Affidavit describes the case background.  Section III of the Affidavit describes the evidence supporting probable cause.  Section IV of the Affidavit explains the basis for searching the residence location.



EXHIBIT  A

1

# SECTION I.  AGENT EXPERIENCE & BACKGROUND

4.    I am employed as Special Agent/Criminal Investigator, having been employed by the Bureau of Immigration and Customs Enforcement for a period of approximately 10 months. During which time, I have been involved in the enforcement of Federal statutes relating to alien smuggling, smuggling, child pornography, income taxation, money laundering, drug trafficking, banking and finance.  I am involved in the enforcement of Federal laws pertaining to drug trafficking, money laundering, smuggling, income and other taxation.   During the time in which I have been a Special Agent, I have received training in the investigation of customs laws, fraud and conspiracy cases and in cases involving money laundering and financial investigative techniques. This training has included attendance for ten weeks of criminal investigation training at the Federal Law Enforcement Training Center conducted by the U.S. Customs Service.

5.    I was employed as a Special Agent/Criminal Investigator, having been employed by the Internal Revenue Service Criminal Investigation Division for a period of approximately 19 years. During which time, I was involved in the enforcement of Federal statutes relating to income taxation, money laundering, drug trafficking, banking and finance.  Prior to this, I was a Tax Examiner for the Internal Revenue Service, for a period of approximately 3 years.  I was assigned to the Organized Crime Drug Enforcement Task Force (OCDETF) and I was involved in the enforcement of Federal laws pertaining to money laundering, income and other taxation.

6.    In the course of my employment with the Internal Revenue Service, I have become familiar with Federal Statutes pertaining to taxation and to illegal money laundering, as well as with the operations and actions of persons engaged in the violation of these statutes.  During the years in which I have been a Special Agent and a Tax Examiner, I have received extensive specialized training in the investigation of tax fraud and conspiracy cases and in cases involving money laundering and financial investigative techniques.  This training has included attendance at the Federal Law Enforcement Training Center, courses in financial investigation, and the tracing of illegal currency transactions conducted by the Internal Revenue Service.  This training has included twenty one weeks of criminal investigation training and advanced financial investigative techniques training conducted by the US Treasury Department and the Internal Revenue Service. In addit Title 18, United States Code, Section 1956(a)(1)(B)(i).ion, I have attended periodic continuing professional education classes relating to forfeiture, financial investigations, illegal tax

protesters and money laundering which included detailed explanations of business, banking and accounting practices and procedures. I have supplemented these by taking college level accounting and business related courses that led to a Bachelor of Arts degree in Accounting from Chaminade University.

7.    In the course of my employment with the Internal Revenue Service and in connection with my training and education, I have become familiar with business practices and the application of accounting principles. I am also familiar with business practices of illegal tax protesters, especially the filing of Employee's Withholding Allowance Certificate, IRS Form W-4.

8.    My experience as a criminal investigator has included at least 80 investigations which involved drug trafficking, income tax law, money laundering, illegal tax protesters, failure to file income tax returns, preparation and submission of false Employee's Withholding Allowance Certificate, IRS Form W-4 and other law enforcement subjects. I have had extensive communication with other State and Federal tax investigators who specialize in the investigation of drug trafficking, illegal tax protesters, tax evasion and money laundering. These State and Federal tax investigators also have experience in interviewing, interrogating, and debriefing defendants, participant witnesses, informants and other persons, who have had personal knowledge and experience of illegal tax protesters, drug traffickers, tax evasion, and money laundering. These State and Federal tax investigators also have experience in the disposition, concealment and laundering of proceeds from illegal tax protester transactions, narcotics trafficking and other specified unlawful activities.

(a)    My awareness and knowledge of drug traffickers, illegal tax protesters, tax evasion and money laundering techniques set forth in this Affidavit, arise from the following:

(b)    My involvement in prior drug trafficking investigations, money laundering investigations, tax and illegal tax protester investigations and searches during his career as a law enforcement officer, as previously described;

(c)    My involvement in the debriefings of confidential informants, cooperating individuals, witnesses and informants in prior drug trafficking investigations, tax and/or money laundering investigations. As well as what other agents and tax officers have advised me when relating the substance of their similar debriefings

and the results of their own drug trafficking, money laundering and tax investigations; and

(d)     Other intelligence information provided through IRS and other law enforcement channels.

9.     During my career as a law enforcement officer, I conservatively estimate that I have been involved in at least 80 drug investigations. In connection with said investigations; I have participated in at least 50 searches of the residences of suspected drug traffickers for controlled substances and other evidence of drug trafficking. I am also aware that drug traffickers deal in a primarily cash business and have large amounts of cash which they must hide to avoid attention and detection. Based on my experience and training, I know that drug traffickers often engage in money laundering to hide the true source of their illegal income from drug trafficking. Using proceeds from the sale of drugs and narcotics, drug traffickers will purchase real estate, vehicles, stocks, bonds, businesses and other investments and assets, using either fictitious names or nominees to hide the true identity of the owner of these assets. As a result of my experience and training, I am familiar with money laundering techniques utilized by drug traffickers in their efforts to move money, reduce its volume, and change its character to allow for spending or investing it while sheltering it from detection and taxation. These techniques are not limited to narcotics, but can be applied to other specified unlawful activities. One technique is to open a small business and run money through it. From there the business can pay out a salary; shelter the money from income taxation by "loaning" it out or transfer the money to a bank account in a bank secrecy country. A second technique, is to open bank accounts and deposit cash in amounts less than $10,000, to prevent the bank from filing a Currency Transaction Report with the Internal Revenue Service. A third technique, is to walk into a number of banks and purchase traveler's checks or walk into a number of post office and purchase international money orders in amounts less than $10,000, to prevent the filing of a Currency Transaction Report with the Internal Revenue Service. Negotiable anywhere in the world, traveler's checks and international money orders can be deposited in any foreign bank account, or held onto until a person wants to spend them.

# SECTION II.  CASE BACKGROUND

## OVERVIEW OF DRUG INVESTIGATION

## VIOLATION OF TITLE 21, UNITED STATES CODE, SECTIONS 856(a)(2) & 856(b).

10.   Based on the following information, BETTY YI HERNANDEZ, a.k.a. "Suki," managed and controlled any building, room, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rented, leased, or made available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.  All in violation of Title 21, United States Code, Sections 856(a)(2) and 856(b).

11.   Since November 1999, there were a number of complaints of illegal drug activity and a number of drug arrests at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814 (hereinafter Swing Video LLC).

12.   Since late 2001, the Honolulu Drug Enforcement Administration, the Honolulu Police Department, the Bureau of Immigration and Customs Enforcement, and the Internal Revenue Service (hereinafter Honolulu DEA Task Force), have been involved in the investigation of the drug trafficking activities taking place within the confines of a business, Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.  The business involves the sale of pornographic video media, and comprises an interior that has approximately eleven individual booths equipped with closed circuit video monitors controlled through a central system operated by employees.  The business, established in the early 1990's was initially located in the Chinatown area of Honolulu, but was moved to its present location in 1999.

13.   This drug investigation has involved the use of police surveillance, undercover police purchases of controlled substances and interviews of witnesses and cooperating defendants.  The information obtained through cooperating defendants, through controlled purchases and through enforcement activity is described as follows.

## INFORMATION OBTAINED THROUGH COOPERATING DEFENDANTS

### STATEMENT OF CS #1

14.    In November 2001, DEA Special Agent Duane STICKLES was contacted by the Honolulu Police Department (HPD) Crime Reduction Unit Officer Derrick Sagawa, who stated that they had just arrested an individual known to them from prior observation as a significant distributor of crack cocaine in the downtown/Chinatown area of Honolulu. This defendant (hereinafter identified as CS#1) elected to cooperate with officers following his arrest and completed a controlled purchase of cocaine from a female supplier, which resulted in the supplier's arrest and subsequent conviction in US District Court in Honolulu, Hawaii. Officer Sagawa informed DEA Special Agent Duane STICKLES that he considered CS#1 to be reliable source of information based on this enforcement activity, as well as corroborative details known to officers from previous investigations. CS#1 was initially interviewed by your DEA Special Agent Duane STICKLES on November 14, 2001, and his cooperation continued through December 2002.

15.    During initial interviews CS#1 provided the following details to your DEA Special Agent Duane STICKLES. CS#1 stated that he had been involved in the distribution of cocaine, in both powder (Cocaine HCL) and "Crack" (Cocaine base) forms, as well as "ice" (Methamphetamine), in association with Arieta YAMAGUCHI for approximately ten years. CS#1 said that YAMAGUCHI and CS#1 had been distributing cocaine on a daily basis for the three months prior to his arrest to a large number of customers at both the L&D Bar, 125 N. Hotel Street, Honolulu, as well as a new location, the River Town Grill, 258 N. Beretania Street, Honolulu. CS#1 estimated that they were distributing between $75,000 to $100,000 worth of crack cocaine every week, as well as a small amount of ice. CS#1 estimated that this was over one kilogram of crack cocaine weekly.

16.    CS#1 said that YAMAGUCHI and her sister, Olita ASIATA (now deceased), would develop and maintains many of their own customers, and had multiple suppliers of cocaine and methamphetamine. CS#1 said that he primarily functioned as a runner for YAMAGUCHI, delivering multi-ounce quantity cocaine to various customers, and picking up drugs from suppliers. CS#1 said that he had routinely delivered cocaine to unidentified YAMAGUCHI sub-distributors at a Honolulu business, "SWING VIDEO" located at 1340 Kapiolani Blvd, Suite 102, Honolulu, and had received cocaine from suppliers at the Pagoda Hotel, 1525 Rycroft Street.

17.    During subsequent debriefings in June 2002, CS#1 stated that he knew the owner of SWING VIDEO as an older Korean female referred to as "Suki." CS#1 identified Betty HERNANDEZ from a Hawaii Drivers license as "Suki." CS#1 said that he had come to know HERNANDEZ very well from his previous distribution activities at SWING VIDEO. CS#1 said that HERNANDEZ was aware of the cocaine trafficking activities routinely taking place within the business, and that she profited personally from them. CS#1 said that HERNANDEZ would normally charge drug dealers utilizing SWING VIDEO a fee to utilize "booths" as a location to distribute cocaine. HERNANDEZ would additionally charge every individual entering SWING VIDEO a $2.00 flat fee. CS#1 informed your DEA Special Agent Duane STICKLES that SWING VIDEO functioned as a hub for drug distribution activities and that nearly every individual frequenting the business either sold or purchased crack cocaine. CS#1 said that, as a normal routine, customers would enter the establishment, pays $2.00 to a SWING VIDEO employee behind a counter and then is directed by the employee to a booth. A sale of cocaine would then be completed between the customer and the cocaine dealers paying for use of the booths. CS#1 said that these activities would continue all through the day and night, and that an extremely large number of drug buyers frequented the business on a daily basis.

## STATEMENT OF ARIETA YAMAGUCHI

18.    As a result of extensive Court Authorized federal wiretaps (Crim #'s MC02-00122DAE and MC02-00196) targeting Arieta YAMAGUCHI's drug trafficking organization, YAMAGUCHI was arrested, and subsequently indicted in Honolulu in December 2002. During post-arrest interviews, YAMAGUCHI stated that HERNANDEZ, known to YAMAGUCHI as "Suki," profited from drug dealers utilizing her business as a distribution location. YAMAGUCHI said that HERNANDEZ would have everyone entering the establishment pay a $2.00 entry fee, and would also make $100.00 per day from each crack cocaine dealer operating inside the business. YAMAGUCHI said that there were eight dealers who worked in shifts within SWING VIDEO, and that these dealers were almost all of Samoan ethnicity. YAMAGUCHI said that the business survives solely on drug sales within the establishment. YAMAGUCHI said that she had been in SWING VIDEO when the drug dealers were selling crack cocaine, and then paying HERNANDEZ for the customers. YAMAGUCHI said that dealers utilized the booths inside SWING VIDEO, but did not know how much they were charged for their use. YAMAGUCHI said that she had known HERNANDEZ to operate in this fashion since the time when SWING VIDEO was located on Hotel Street, Honolulu

(DEA Special Agent Duane STICKLES is aware that SWING VIDEO relocated from Hotel Street to Kapiolani Blvd in 1999). YAMAGUCHI is currently awaiting trial in the US District of Hawaii.

## STATEMENT OF CS #2

19. On December 12, 2002, a person was arrested for distribution of cocaine base inside Swing Video (hereinafter CS #2) by Honolulu PD Officers and provided a post arrest statement to DEA Agents. CS #2 detailed her crack cocaine trafficking activities from within SWING VIDEO, and estimated that she had been selling between two and five ounces of cocaine every ten to fourteen days. CS #2 said that she conducted these activities in association with other individuals at Swing Video. CS #2 stated that a group of primarily female Samoan individuals routinely sold crack cocaine to customers within the establishment, and only individuals known to these dealers were allowed to distribute crack cocaine within the business. CS #2 said that between 95 to 99 percent of the people entering SWING VIDEO were there to sell, purchase or use crack cocaine, and that most individuals are inside for a minute. CS #2 said that both the customers and the dealers used the booths inside the business to sell and consume drugs. CS #2 said that all customers entering SWING VIDEO had to pay a $2.00 entry fee, and then pay an hourly rate to rent a booth. Dealers within the business would take turns selling cocaine as customers entered the business. CS #2 said that all fees are collected by the business employees, or the owner, Betty HERNANDEZ. CS #2 said that HERNANDEZ is aware of the drug dealing at SWING VIDEO but pretends that she does not know about it. CS #2 said that HERNANDEZ makes money from the entry and hourly fees paid by the drug customers and dealers. CS #2 said that HERNANDEZ occasionally kicks dealers out of SWING VIDEO, but that these dealers would come back to sell in the evening after HERNANDEZ departed. CS #2 said that HERNANDEZ had instructed the group of dealers to have a meeting and work out the schedule or she would kick them all the dealers out of the business.

## STATEMENT OF CS #3

20.    On March 27, 2003, CS #3 was arrested by the Honolulu Police Department and provided a post-arrest statement to officers and DEA agents. CS #3 stated that he had sold crack cocaine from within SWING VIDEO from approximately April or May 2002 to approximately July 23, 2002. CS #3 said that he initially sold cocaine between the hours of 9:00am to 10:00pm, and would pay a $10.00 fee to each SWING VIDEO employee as they took over the business counter. CS #3 said

that he sold approximately one half ounce of crack cocaine daily to customers entering SWING VIDEO. CS #3 said that numerous individuals routinely sold crack cocaine to customers entering the establishment, and that these dealers would take turns servicing these customers. CS #3 said that the owner of SWING VIDEO, known to CS #3 as "Suki," was aware of the sale of cocaine within the business, and that she would allow the dealers to sell cocaine inside the business as long as they paid hourly fees to the business. CS #3 said that after his first month dealing inside SWING VIDEO, he had an argument with HERNANDEZ over a fee, and HERNANDEZ had thrown him out. CS #3 then began selling cocaine in the evening when HERNANDEZ had left, and paid his fees to the various employees behind the counter. CS #3 said that customers would use the booths inside the establishment to purchase and consume crack cocaine. CS #3 said that he would personally sell cocaine to between forty to seventy customers daily inside SWING VIDEO.

## STATEMENT OF CS #4

21.    On May 29, 2003, CS #4 was interviewed by DEA agents regarding her crack cocaine distribution activities within SWING VIDEO. CS #4 had been charged with distribution of cocaine base in the United States District Court Honolulu, and had elected to cooperate with law enforcement. CS #4 stated that she had begun selling crack cocaine from within SWING VIDEO in 1997 when the business had been located in the downtown area of Honolulu. CS #4 said that the owner, known to CS #4 as "Suki" (HERNANDEZ), charged cocaine dealers a cover charge to allow them to sell cocaine from within the business. CS #4 had personally discussed the sale of cocaine and the associated fees with HERNANDEZ, but CS #4 noted that HERNANDEZ always attempted to give the appearance that she didn't know what the dealers were doing. CS #4 said that all dealers had to pay the employees $10.00 per shift to stay in the business. CS #4 recalled that a relative had also sold cocaine from within SWING VIDEO, and that HERNANDEZ had demanded $20.00 per shift as her relative was making so much money selling from within the business. CS #4 said that all customers entering SWING VIDEO had to pay a $2.00 entry fee, and that HERNANDEZ made money by keeping the cocaine dealers in the business to attract the customers. CS #4 said that she was arrested in 1998, but returned to selling cocaine in early 1999. CS #4 said that she again utilized SWING VIDEO and that by this time the business had moved to its present location on Kapiolani Boulevard. CS #4 continued selling cocaine from SWING VIDEO until approximately May, 2002. CS #4 said that HERNANDEZ had initially refused her entry into the business, but later had agreed to allow CS #4 into the business to sell cocaine for a fee of $10.00 per shift. CS #4 said that she would stay in the business all day, and paid

$30.00 per day to the employees. CS #4 said that HERNANDEZ relied on drug dealers to keep customers coming into SWING VIDEO, and that there were usually ten to fifteen people selling drugs in the business at any one time. CS #4 said that if business was slow HERNANDEZ would call certain drug dealers she was close to, and have them come down to SWING VIDEO to sell cocaine. CS #4 said that cocaine was routinely sold out in the open areas of the business, and that the business employees "look the other way." CS #4 said that she would keep her cocaine hidden in various locations throughout the business as she never wanted to keep them on her person.

## STATEMENT OF CS #5

22.    On February 25, 2003, CS #5 was arrested by Honolulu Police Department officers for distributing cocaine base from SWING VIDEO. CS #5 subsequently provided a post-arrest statement to DEA agents. CS #5 stated that he visits SWING VIDEO to sell crack cocaine about two times per week. CS #5 stated that he normally paid $5.00 when he entered the business and said that the fee was paid to whoever was working at the business counter. CS #5 said that he was charged an additional $5.00 for every half hour he was in the business. FAAOLA said that he sold cocaine to strangers who walked up to him and ask for it. FAAOLA said that he didn't know how much other people had to pay to stay in the business.

## STATEMENT OF CS #6

23.    On October 16, 2003, CS #6 was interviewed by DEA and Bureau of Immigration and Customs Enforcement (BICE) agents. CS #6 stated that she began selling crack cocaine from within SWING VIDEO in late 1999 to early 2000. CS #6 said that the owner of SWING VIDEO, known to OH as "Suki" (HERNANDEZ), made money from charging drug users and drug dealers to utilize SWING VIDEO. In addition to charging everyone entering the business $2.00, CS #6 said that HERNANDEZ would charge $5.00 for every half hour CS #6 and other dealers were in the business selling cocaine. OH said that HERNANDEZ and other employees frequently demanded additional cash which had to be paid or she (as well as the other dealers) would be kicked out. CS #6 estimated that during this period she paid between $300 to $350.00 per day to HERNANDEZ for selling crack cocaine within SWING VIDEO. CS #6 said that she again sold cocaine from within SWING VIDEO between December 2000 and March 2001. During this period CS #6 estimated that she again paid HERNANDEZ approximately $300 per day to sell cocaine

from within the business. CS #6 said that HERNANDEZ regularly saw CS #6 smoking cocaine base inside her booth with her door open, and that HERNANDEZ would yell at her to close the door to her booth. CS #6 returned to SWING VIDEO again to sell crack cocaine from approximately April, 2002 to October, 2002. CS #6 said that during this period she was required to pay a $20.00 per hour fee to the business while she was selling cocaine within the establishment. CS #6 said that dealers also had to pay "tips" to HERNANDEZ and the business employees, as well as cash "on demand." HERNANDEZ would kick out any dealer who didn't pay what was demanded. CS #6 said that during 2002, approximately five to six ounces of crack cocaine was sold within the business daily by dealers, and that HERNANDEZ directly received approximately half of the net profit, about $700 per ounce. CS #6 said that dealers also paid $20.00 to $40.00 for a guarantee that they would be warned if the police entered the business. Employees would give the warning by flashing the picture or changing the channel on the closed circuit TV system (each booth had a monitor) or rapidly accelerating the TV timer and creating a warning sound. After a brief imprisonment, CS #6 returned to SWING VIDEO in June, 2003. CS #6 said that she formed a partnership with a friend and negotiated with HERNANDEZ to have exclusive rights to sell cocaine within SWING VIDEO for a four to five hour period. HERNANDEZ charged CS #6 and the friend $500.00 for this privilege. CS #6 and the friend paid HERNANDEZ extra money to receive any warnings of police presence, as well as $40.00 per hour to use the booths to complete the exchanges within the business. CS #6 said that she and the friend had similar arrangements with HERNANDEZ the two following days but were unable to pay HERNANDEZ what she demanded for compensation. HERNANDEZ then "86'd" OH and the friend from the business (CS #6 said that the term "86" refers to anyone HERNANDEZ identifies as not being allowed to reenter SWING VIDEO). CS #6 said that HERNANDEZ kept a list of those "86'd" dealers on a piece of paper taped on the wall behind the business counter. CS #6 said that between July and September, 2003, she visited SWING VIDEO every day to purchase crack cocaine for her own use. CS #6 would ensure that she did not enter the business when HERNANDEZ was present. A separate interview with the friend of CS #6 corroborated the details of the drug dealing activities described by CS #6 in mid-June, 2003.

## STATEMENT OF CS #7

24.    On October 16, 2003, CS #7 was interviewed by DEA and BICE agents concerning her knowledge of Swing VIDEO and Betty HERNANDEZ. CS #7 stated that she had met HERNANDEZ in approximately 1992 when CS #7 began selling crack cocaine from SWING

VIDEO in its Chinatown location. CS #7 believed HERNANDEZ was the owner of the business. CS #7 said that she and her boyfriend could at times profit $18,000.00 per day selling crack cocaine to walk-in customers in SWING VIDEO. CS #7 recalled that she paid HERNANDEZ directly "tips" in order to be allowed to sell cocaine within the business. CS #7 also occasionally paid HERNANDEZ $200.00 in order to have exclusive rights to sell cocaine to customers in SWING VIDEO. HERNANDEZ would kick out other dealers from the business in return for this payment. These activities continued into the mid to late 1990's. CS #7 recalled that HERNANDEZ would allow CS #7 to utilize the microwave oven at the business in order to convert the powder cocaine to crack cocaine. CS #7 said that she returned to selling crack cocaine from SWING VIDEO from August 2001 to November 2001. SWING VIDEO was now located at its present Kapiolani Blvd location. CS #7 said that HERNANDEZ established rules for drug dealers utilizing SWING VIDEO for distribution. Each drug customer paid $2.00 to enter the business. Each dealer would pay $5.00 to the business for every drug customer who purchased crack cocaine from that particular dealer. Each dealer paid an additional $20.00 per hour to sell crack cocaine in the business and for the use of a booth. Each dealer was also expected to provide "tips" to HERNANDEZ or other employees of at least $20.00. CS #7 estimated that during this period she sold between two to three ounces of crack cocaine daily from within the business. CS #7 estimated that between August 2001 and November 2001 she had paid HERNANDEZ approximately $2000.00 per day in fees and tips for selling crack cocaine in SWING VIDEO. CS #7 said that SWING VIDEO provided a "safe" place for dealers to sell crack cocaine, but that the dealers were "extorted" daily for money from HERNANDEZ and SWING VIDEO employees. CS #7 also stated that dealers paid extra funds to HERNANDEZ for a police warning system which included changing channels on the closed circuit TV monitors in the booths and speeding up the timer to cause an audible warning sound. CS #7 said that dealers would hide their cocaine throughout the business, including in and around the booths, TV monitoring equipment, and holes in furniture. CS #7 said that people entered SWING VIDEO for the purpose of purchasing, selling, and smoking crack cocaine. All dealers believed that anyone entering the business to only watch videos must be a police officer. CS #7 said that she had returned to sell crack cocaine at SWING VIDEO in June, 2003. CS #7 added that drug users and dealers regularly utilized purified water, baking soda, steel wool, lighters, and a microwave oven which were kept behind the business counter at SWING VIDEO.

## STATEMENT OF CS #8

25.    On October 29, 2003, CS #8 was arrested by HPD officers for distributing cocaine base inside Swing Video.  CS #8 subsequently provided a post-arrest statement to DEA/HPD officers. CS #8 said that she had smoked and sold crack cocaine daily from within SWING VIDEO for about a three year period, ending around October, 2002.  CS #8 said that she functioned primarily as a runner for the crack dealers who regularly sold within the business.  CS #8 said that at any one time there would be between two to five "dealers," and the same number of "runners" within the business serving walk-in customers.  CS #8 said that she would pay SWING VIDEO employees $5.00 per half hour to rent a booth.  CS #8 would use the booth to smoke crack cocaine and to sell it to customers. CS #8 estimated that she would sell cocaine to about fifty people in any 24 hour period, and that over 100 people would come into SWING VIDEO, mostly to purchase cocaine, on a daily basis.  CS #8 said that all customers had to pay the business a $2.00 entrance fee, and the dealers normally paid $20.00 to enter.  CS #8 said the dealers had separate fee arrangements with the employees in order to sit at the business counter and sell cocaine for extended periods. CS #8 said that SWING VIDEO makes money from the sale of drugs, and that almost all of the people coming into the business are there to purchase drugs.  CS #8 said that the dealers and employees were running a "big drug operation."  During the time she was selling or using drugs inside SWING VIDEO, CS #8 said that she would hide her cocaine within small holes in the walls and furniture within the booths.

## STATEMENT OF CS #9

26.    On October 15, 2003, CS #9 was arrested by HPD officers.  CS #9 provided a post-arrest statement to DEA and HPD officers in which she detailed her cocaine distribution activities at SWING VIDEO.  CS #9 stated that she had sold crack cocaine from within the business from early 2001 to late 2002.  CS #9 said that large numbers of individuals would enter SWING VIDEO to purchase crack cocaine, and CS #9 knew some of these individuals as regular customers, but said many were complete strangers.  CS #9 and other dealers would take turns selling crack cocaine to these customers as they arrived.  CS #9 said that she and other dealers would rent booths from within which she would smoke and sell cocaine.  CS #9 said that SWING VIDEO customers would pay $2.00 to enter the business, and then proceed to a booth, assigned by an employee at the counter, where pornographic videos could be viewed.  CS #9 and other dealers would approach

the customer and complete the sale of crack cocaine in or near the booth. CS #9 said that the principle dealers would regularly sit at the business counter and play games on gambling machines while they waited on customers. The dealers would have to pay $20.00 to $40.00 to the employees to stay in the business. CS #9 said that she did not see the owner, known to CS #9 as "Mama Suki," very often as CS #9 visited SWING VIDEO in the evenings, and HERNANDEZ would be present during the day. CS #9 said that on the occasion that HERNANDEZ was present at the same time, HERNANDEZ may kick her out of the business, "depending on her mood."

## STATEMENT OF CS #10

27.     On September 9, 2003, CS #10 was arrested by HPD officers for drug related violations. CS# 10 elected to cooperate with officers/DEA agents and provided a statement regarding her trafficking activities. CS #10 said that she had been purchasing approximately one ounce of crack cocaine daily from a dealer inside SWING VIDEO since approximately July, 2003. CS #10 would resell this cocaine to buyers in the Chinatown area of Honolulu. CS #10 said that the owner of SWING VIDEO, known to CS #10 as "Suki" (HERNANDEZ), was paid by the various dealers for the use of the business as a distribution point. CS #10 said that HERNANDEZ would only allow those dealers whom she approved to sell drugs within the business. CS #10 said that dealers would pay to HERNANDEZ, and/or her employees, $10.00 per half hour while selling drugs. CS #10 said that all customers entering SWING VIDEO had to pay a $2.00 entry fee.

## CONTROLLED PURCHASES/ENFORCEMENT ACTIVITY

28.     Based on discussions with HPD Officers, as well as a detailed review of HPD investigative records, DEA Special Agent Duane STICKLES has identified over 135 drug related incidents taking place at SWING VIDEO between the period October 1999 to present. Of these incidents, approximately 49 separate undercover purchases of crack cocaine were made by HPD Officers from a large number of identified individuals within SWING VIDEO. These purchases routinely involved the entrance of an undercover into SWING VIDEO, the meeting of the officer with any individual selling cocaine, and the exchange of money for drugs in various locations throughout the business. The officer would then exit the business and meet with supporting officers. These purchases usually involved the sale of approximately $20.00 of crack cocaine. All cocaine seized in this fashion was tested by the HPD lab and found to contain cocaine base. Approximately eighty-three of the above noted police incidents involved the seizure of quantities of crack cocaine

or drug related paraphernalia from within SWING VIDEO during police inspections or during the execution of state authorized search warrants. During 2003, quantities of crack cocaine and/or drug paraphernalia were recovered during police enforcement activities within SWING VIDEO on January 7, February 19, February 20, April 4, April 27, April 30, June 3, June 5, June 10, June 15, and December 3.

## JANUARY 7, 2003

29.    On January 7, 2003, during the course of an undercover purchase of crack cocaine within SWING VIDEO, the HPD officer was directed to booth #10 (all booths are identified by number) by Betty HERNANDEZ to wait for a drug dealer, later identified as "Uncle" Koli FAAOLA to deliver cocaine. HERNANDEZ told the undercover officer, "pay $2.00 and wait inside the booth. Uncle not here yet." While walking to the booth, the officer observed Betty HERNANDEZ standing outside booth #1 saying, "all you guys wait inside the booths for uncle." Koli FAAOLA had been previously identified by other individuals inside SWING VIDEO as "Uncle Koli." The undercover officer observed that others in the business also appeared to be waiting for drugs as well. The officer then heard HERNANDEZ yell to an unidentified individual, "hey, don't sell your drugs outside, the neighbors will call the police. Get inside." After purchasing the crack cocaine from FAAOLA, the officer exited the booth and displayed the cocaine to HERNANDEZ as he departed the business. Approximately 25 minutes later, HPD Officer Michael Cusumano, an officer known to HERNANDEZ from previous visits to SWING VIDEO, entered the business but was stopped by HERNANDEZ, grabbing the officer by the arm. HERNANDEZ stated that "I never see you for a while." Officer Cusumano noted that he believed that HERNANDEZ was intentionally attempting to prevent him from entering the rear portion of the business.

## DECEMBER 3, 2003

30.    On December 3, 2003, an HPD undercover officer entered SWING VIDEO. After paying his entry fee of $2.00, the officer was directed to booth #3 by the employee. Once inside the booth, the officer was joined by Beth Ann ARAKI. ARAKI asked the officer, "how much?" The officer replied that he wanted, "twenty," referring to $20.00 worth of crack cocaine. ARAKI then displayed to the officer two pieces of crack cocaine taken from her pocket. ARAKI also withdrew from a bag a glass pipe, and told the officer, "It's your lucky day, take a hit." The officer attempted to avoid the offer, but ARAKI insisted that the officer smoke from the pipe before selling him the

cocaine. ARAKI then departed the booth when the officer again refused. Following the undercover officer's departure from SWING VIDEO, supporting officers entered the establishment, located ARAKI, and placed her under arrest. A subsequent search of her person recovered approximately two grams of crack cocaine and paraphernalia. The HPD lab later confirmed the substance to be cocaine base.

## OVERVIEW OF FINANCIAL INVESTIGATION

## ALLEGATIONS AGAINST BETTY YI HERNANDEZ

31.        According to the Honolulu DEA Task Force investigation, hardly anyone came to Swing Video LLC solely to watch pornographic adult movies. Instead, BETTY YI HERNANDEZ allowed drug dealing at Swing Video LLC in exchange for cash. According to the Honolulu DEA Task Force investigation, BETTY YI HERNANDEZ had a variable payment schedule for drug dealers at Swing Video LLC. For example: There were times where drug dealers paid $20.00 to work a "shift" at Swing Video LLC. There were times where drug dealers paid $20.00 an hour to sell crack cocaine at Swing Video LLC. There were times where drug dealers paid $5.00 for every drug customer that came into Swing Video LLC. There were times where drug dealers paid $30.00 to $40.00 an hour for the use of a room at Swing Video LLC. Drug dealers paid their money to BETTY YI HERNANDEZ or to a Swing Video employee.

32.    According to the Honolulu DEA Task Force investigation, hardly anyone came to Swing Video LLC solely to watch pornographic adult movies. Instead, BETTY YI HERNANDEZ allowed drug users to purchase drugs at Swing Video LLC in exchange for cash. According to the Honolulu DEA Task Force investigation, BETTY YI HERNANDEZ had a variable payment schedule for drug users at Swing Video LLC. For example: There were times where drug users paid $2.00 to enter Swing Video LLC to purchase drugs. There were times where drug users paid $5.00 to use drugs in Swing Video LLC for half an hour. There were times where drug users paid $10.00 to use drugs in Swing Video LLC for one hour. There were times where drug users paid $30.00 an hour for one person to use drugs in a booth in Swing Video LLC. There were times where drug users paid $40.00 per hour for two persons to use drugs in a booth in Swing Video LLC. Drug users paid their money to BETTY YI HERNANDEZ or to a Swing Video employee.

## REVIEWING THE FINANCIAL BACKGROUND OF BETTY Y. HERNANDEZ

33.    This financial investigation has involved the review of the financial background of both the Swing Video LLC and BETTY YI HERNANDEZ to find evidence of the laundering of illicitly obtained funds through the use of financial institutions and/or the purchase of assets. The financial investigation of BETTY YI HERNANDEZ and Swing Video LLC is described as follows.

34.    Based on my experience and training, I know that drug traffickers and people associated with drug traffickers engage in money laundering to hide the true source of their illegal income. One technique is to open a small business and run money through it. From there the business can pay out a salary; purchase real property; purchase vehicles and transfer money to other bank accounts in nominee names. Another technique is to open bank accounts and deposit cash in amounts less than $10,000 to prevent bank from filing a Currency Transaction Report (hereinafter CTR) with the Internal Revenue Service (hereinafter IRS).

35.    Based on my experience and training, I conducted a financial investigation to determine if BETTY YI HERNANDEZ had any Additional Taxable Income in 1999, 2000, 2001, and 2002 which indicates an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug dealers and drug users.

## PUBLIC RECORDS

36.    During the course of my investigation, I reviewed State of Hawaii Bureau of Conveyance Honolulu Real Property Assessment and Commercial (hereinafter BOC) records and State of Hawaii Department of Commerce and Consumer Affairs (hereinafter DCCA) records for BETTY YI HERNANDEZ, Kwang Sup SHIN (husband), Swing Video, Swing Video LLC, Tenny Corporation and North King Shell Station.

## SUBPOENAED RECORDS

37.    During the course of my investigation, grand jury subpoenas were issued to American Savings Bank (hereinafter ASB); City Bank (hereinafter CB); First Hawaiian Bank (hereinafter FHB); Riald Investment Company Inc. (hereinafter RIALD), Shell Oil Company (hereinafter

SHELL), Sofos Realty Inc. (hereinafter SOFOS) and the University of Hawaii Federal Credit Union (hereinafter UHFCU) for the records of BETTY YI HERNANDEZ, Kwang Sup SHIN (husband), Swing Video, Swing Video LLC, Tenny Corporation and North King Shell Station.

38.    During the course of my investigation, I reviewed the bank records of American Savings Bank, City Bank, First Hawaiian Bank, Riald Investment Company Inc., Shell Oil Company, Sofos Realty Inc., and the University of Hawaii Federal Credit Union.

## FEDERAL INCOME TAX RETURNS

39.    During the course of my investigation, I reviewed the 1997 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.

40.    During the course of my investigation, I reviewed the 1998, 1999, 2000, 2001 and 2002 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ and Kwang Sup SHIN, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.

## SECTION III.  EVIDENCE SUPPORTING PROBABLE CAUSE

## MONEY LAUNDERING VIOLATIONS

## TITLE 18, UNITED STATES CODE, SECTION 1956(a)(1)(A)(i)

41.    The following evidence will show that BETTY YI HERNANDEZ had committed violations of Title 18, United States Code, Section 1956(a)(1)(A)(i).

42.    For example, based on the evidence, BETTY YI HERNANDEZ, intentionally and knowingly conducted a financial transaction affecting interstate commerce, i.e. issuing First Hawaiian Bank checks and issuing University of Hawaii Federal Credit Union checks payable to Sofos Realty, knowing that the property involved in the financial transaction represented the proceeds of some form of a specified unlawful activity, i.e. making available a room for the distribution of controlled substances in violation of Title 21, United States Code, Section 856(a)(2), with the intent to promoted the carrying on of the specified unlawful activity.  Based on the following information, BETTY YI HERNANDEZ made total lease rent payments to Sofos Realty for Swing Video LLC,

1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814, in the amounts of $60,564.59 in 1999, $89,719.24 in 2000, $89,719.24 in 2001, $88,008.92 in 2002, and $85,206.09 in 2003. All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

## TITLE 18, UNITED STATES CODE, SECTION 1956(a)(1)(B)(i)

43.     The following evidence will show that BETTY YI HERNANDEZ had committed violations of Title 18, United States Code, Section 1956(a)(1)(B)(i).

44.     For example, based on the evidence, BETTY YI HERNANDEZ, intentionally and knowingly conducted a financial transaction affecting interstate commerce, i.e. issuing First Hawaiian Bank checks payable to Countrywide Mortgage, knowing that the property involved in the financial transaction represented the proceeds of some form of a specified unlawful activity, i.e. making available a room for the distribution of controlled substances in violation of Title 21, United States Code, Section 856(a)(2), knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity. Based on the following information, BETTY YI HERNANDEZ made total mortgage interest payments to Countrywide Mortgage for 3075 Ala Poha Place, Unit 1609, in the amounts of $4,404.00 in 1999, $18,953.00 in 2000, $20,945.00 in 2001 and $16,536.00 in 2002. All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## EVIDENCE SUPPORTING MONEY LAUNDERING VIOLATIONS

## STEP 1.  DETERMINING REPORTED TAXABLE INCOME FOR BETTY YI HERNANDEZ

45.     During the course of my investigation, I reviewed the 1997 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.

46.     During the course of my investigation, I reviewed the 1998, 1999, 2000, 2001 and 2002 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ and Kwang Sup SHIN, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.

47.    Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the foregoing facts and based on my experience and training, I prepared the following Schedule of Reported Taxable Income based on the U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ and Kwang Sup SHIN, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.

48.    This was done to determine how much taxable income BETTY YI HERNANDEZ and Kwang Sup SHIN had reported on their 1997, 1998, 1999, 2000, 2001 and 2002 U.S. Individual Income Tax Return (Form 1040).

## SCHEDULE OF REPORTED TAXABLE INCOME

| DESCRIPTION | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|
| Wages | $ - | $ - | $ - | $ 2,000.00 | $ 24,000.00 | $ 18,000.00 |
| Taxable Interest | $ 189.00 | $ 477.00 | $ 84.00 | $ 233.00 | $ 355.00 | $ 185.00 |
| Taxable Refunds | $ - | $ - | $ 497.00 | $ - | $ 134.00 | $ - |
| Business Income/(Loss) | $19,472.00 | $25,537.00 | $(3,072.00) | $35,344.00 | $60,996.00 | $69,547.00 |
| Other Gains/(Loss) | $ - | $ - | $(15,836.00) | $ - | $ - | $(14,046.00) |
| Rental Income/(Loss) | $ 594.00 | $(21,924.00) | $(15,179.00) | $ 1,414.00 | $(18,818.00) | $(21,771.00) |
| Other Income/(Loss) | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Income | $20,255.00 | $ 4,090.00 | $(33,506.00) | $(32,087.00) | $ (4,601.00) | $ 7,500.00 |
| Self Employment Tax | $ (1,376.00) | $ (1,804.00) | $ - | $ 6,904.00 | $ 62,066.00 | $ 59,415.00 |
| Self Employed Insurance | $ - | $ (1,918.00) | $ - | $ (2,497.00) | $ (4,309.00) | $ (4,914.00) |
| Adjusted Gross Income | $18,879.00 | $ 368.00 | $(33,506.00) | $ 4,407.00 | $ 53,537.00 | $ 54,501.00 |
| Medical Expenses | $ - | $ (2,316.00) | $ - | $ - | $ - | $ - |
| Taxes | $ - | $ (1,854.00) | $ (515.00) | $ (1,260.00) | $ (2,301.00) | $ (2,219.00) |
| Miscellaneous | $ - | $ - | $ - | $ - | $ - | $ (7,500.00) |
| Mortgage Interest | $ - | $(10,760.00) | $(16,765.00) | $(18,954.00) | $(20,945.00) | $(16,536.00) |
| Total Itemized Deductions | $ - | $(14,930.00) | $(17,280.00) | $(20,214.00) | $(23,246.00) | $(26,255.00) |
| Standard Deduction | $ (6,050.00) | $ - | $ - | $ - | $ - | $ - |
| Less Exemptions | $ (5,300.00) | $ (8,100.00) | $ (5,500.00) | $ (5,600.00) | $ (5,800.00) | $ (6,000.00) |
| Taxable Income | $ 7,529.00 | $(22,662.00) | $(56,286.00) | $(21,407.00) | $ 24,491.00 | $ 22,246.00 |

## 1997 REPORTED TAXABLE INCOME

49.    In 1997, the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ had taxable income of $7,529.00.

NOTE: According to IRS records, BETTY YI HERNANDEZ filed a 1997 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818. Attached to the 1997 U.S. Individual Income Tax Return (Form 1040) was a 1997 Schedule C (Form 1040) claiming BETTY YI HERNANDEZ as the Sole Proprietor of Swing Video. The 1997 Schedule C claimed income and expenses concerning a retail and rental video and magazine business called Swing Video, 35 North Hotel Street, Honolulu, Hawaii 96817. Attached to the 1997 U.S. Individual Income Tax Return (Form 1040) was a 1997 Schedule E (Form 1040) claiming rental income and expenses on Waialae Iki property.

## 1998 REPORTED TAXABLE INCOME

50.     In 1998 the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of ($22,662.00).

NOTE:  According to IRS records, BETTY YI HERNANDEZ and Kwang Sup SHIN filed a 1998 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ and Kwang Sup SHIN, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818. Attached to the 1998 U.S. Individual Income Tax Return (Form 1040) was a 1998 Schedule C (Form 1040) claiming BETTY YI HERNANDEZ as the Sole Proprietor of Swing Video.  The 1998 Schedule C claimed income and expenses concerning a retail and rental video and magazine business called Swing Video, 35 North Hotel Street, Honolulu, Hawaii 96817.  Attached to the 1998 U.S. Individual Income Tax Return (Form 1040) was a 1998 Schedule E (Form 1040) claiming rental income and expenses on Waialae Iki property.

## 1999 REPORTED TAXABLE INCOME

51.     In 1999 the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of $(56,286.00).

NOTE:  According to IRS records, BETTY YI HERNANDEZ and Kwang Sup SHIN filed a 1999 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ and Kwang Sup SHIN, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.  Attached to the 1999 U.S. Individual Income Tax Return (Form 1040) was a 1999 Schedule C (Form 1040) claiming BETTY YI HERNANDEZ as the Sole Proprietor of Swing Video.  The Schedule C claimed income and expenses concerning a retail and rental video and magazine business called Swing Video, 35 North Hotel Street, Honolulu, Hawaii 96817.  Attached to the 1999 U.S. Individual Income Tax Return (Form 1040) was a 1999 Schedule C (Form 1040) claiming BETTY YI HERNANDEZ as the Sole Proprietor of Swing Video LLC.  The 1999 Schedule C claimed income and expenses concerning a retail and rental video and magazine business called Swing Video LLC, 1340 Kapiolani Blvd., #2, Honolulu, Hawaii 96814.  Attached to the 1999 U.S. Individual Income Tax Return (Form 1040) was a 1999 Schedule E (Form 1040) claiming rental income and expenses on Waialae Iki property.

## 2000 REPORTED TAXABLE INCOME

52.    In 2000 the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of $(21,407.00).

NOTE:  According to IRS records, BETTY YI HERNANDEZ and Kwang Sup SHIN filed a 2000 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ and Kwang Sup SHIN, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.  Attached to the 2000 U.S. Individual Income Tax Return (Form 1040) was a 2000 Schedule C (Form 1040) claiming BETTY YI HERNANDEZ as the Sole Proprietor of Swing Video LCC.  The 2000 Schedule C claimed income and expenses concerning a retail and rental video and magazine business called Swing Video LLC, 1340 Kapiolani Blvd., #2, Honolulu, Hawaii 96814.  NOTE: Attached to the 2000 U.S. Individual Income Tax Return (Form 1040) was a 2000 Schedule E (Form 1040) claiming rental income and expenses on Waialae Iki property.

## 2001 REPORTED TAXABLE INCOME

53.    In 2001 the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of $24,491.00.

NOTE:  According to IRS records, BETTY YI HERNANDEZ and Kwang Sup SHIN filed a 2001 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ and Kwang Sup SHIN, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.  Attached to the 2001 U.S. Individual Income Tax Return (Form 1040) was a 2001 Schedule C (Form 1040) claiming BETTY YI HERNANDEZ as the Sole Proprietor of Swing Video LLC.  The 2001 Schedule C claimed income and expenses concerning a retail and rental video and magazine business called Swing Video LLC, 1340 Kapiolani Blvd., #2, Honolulu, Hawaii 96814. Attached to the 2001 U.S. Individual Income Tax Return (Form 1040) was a 2001 Schedule E (Form 1040) claiming rental income and expenses on Waialae Iki property.

## 2002 REPORTED TAXABLE INCOME

54.    In 2002 the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of $22,246.00.

NOTE:  According to IRS records, BETTY YI HERNANDEZ and Kwang Sup SHIN filed a 2002 U.S. Individual Income Tax Return (Form 1040) concerning BETTY YI HERNANDEZ and Kwang Sup SHIN, 3075 Ala Poha Place, Apt. 1609, Honolulu, Hawaii 96818.  Attached to the 2002 U.S. Individual Income Tax Return (Form 1040) was a 2002 Schedule C (Form 1040) claiming BETTY YI HERNANDEZ as the Sole Proprietor of Swing Video LLC.  The 2002 Schedule C claimed income and expenses concerning a retail and rental video and magazine business called Swing Video LLC, 1340 Kapiolani Blvd., #2, Honolulu, Hawaii 96814.  Attached to the 2002 U.S. Individual Income Tax Return (Form 1040) was a 2002 Schedule E (Form 1040) claiming rental income and expenses on Waialae Iki property.

## STEP 2.  DETERMINING THE NET WORTH OF BETTY YI HERNANDEZ

55.     Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the foregoing facts and based on my experience and training, I conducted a financial investigation to try to determine the Net Worth of BETTY YI HERNANDEZ and Kwang Sup SHIN.

56.     01/08/2001, according to SHELL records, BETTY YI HERNANDEZ dba Tenny Corporation filed an Amendment of Purchase Agreement with David & Jennifer Corporation for the purchase of North Shell King Station, 666 North King Street, Honolulu, Hawaii in the amount of $120,000.

57.     As of January 2001, according to SHELL records, BETTY YI HERNANDEZ submitted the following financial statement reporting Total Current Assets of $290,000.00, Total Fixed Assets of $840,000.00, Total Current and Fixed Assets of $1,300,000.00, Total Liabilities of ($550,785.00) and Total Net Worth of $579,215.00.

## FINANCIAL STATEMENT FOR BETTY YI HERNANDEZ

### AS OF JANUARY 2001

| Current Assets | | |
|---|---|---|
| Cash & CD's | $ | 160,000.00 |
| Notes Receivable | $ | 40,000.00 |
| Life Insurance Cash Value | $ | 5,000.00 |
| Cash in Banks | $ | 85,000.00 |
| Total Current Assets | $ | 290,000.00 |
| Fixed Assets | | |
| Business Equipment | $ | 10,000.00 |
| Goodwill | $ | 40,000.00 |
| Home Residence | $ | 290,000.00 |
| Rental Residence | $ | 450,000.00 |
| Cars | $ | 30,000.00 |
| Jewelry | $ | 20,000.00 |
| Total Fixed Assets | $ | 840,000.00 |
| Total Current & Fixed Assets | $ | 1,130,000.00 |
| Liabilities | | |
| Real Estate Mortgage Home | $ | (207,670.00) |
| Real Estate Mortgage Rental | $ | (300,000.00) |
| Home Equity Loan | $ | (26,453.00) |
| Credit Card Debt | $ | (5,360.00) |
| Auto Loan | ($11,302) | |
| Total Liabilities | $ | (550,785.00) |
| Net Worth | $ | 579,215.00 |

## STEP 3. DETERMINING THE EXISTENCE OF UNIDENTIFIED BANK DEPOSITS

### FIRST INDICATION OF FRAUD

58.    By January 2001, BETTY YI HERNANDEZ and Kwang Sup SHIN had acquired a net worth of $579,215.00 when having taxable income of ($22,622.00) in 1998, ($56,286.00) in 1999 and ($21,407.00) in 2000.

59.    Based on my experience and training, I know that BETTY YI HERNANDEZ having a net worth of $579,215.00 when having taxable income of ($22,622.00) in 1998, ($56,286.00) in 1999 and ($21,407.00) in 2000 was an indication of fraud and indicates an inherent appearance of income.

## DETERMINING UNIDENTIFIED BANK DEPOSITS

60.     Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based upon the indications of fraud committed by BETTY YI HERNANDEZ and Kwang Sup SHIN, based upon the foregoing facts and based on my experience and training, I prepared the following Schedule of Total Bank Deposits to determine if BETTY YI HERNANDEZ and Kwang Sup SHIN had any unidentified banks deposits in 1999, 2000, 2001, and 2002 that would indicate an inherent appearance of income.

## SCHEDULE OF TOTAL BANK DEPOSITS

| ITEMS | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| City Bank Cash Deposits | $ 3,000.00 | $ 9,000.00 | $ 5,100.00 | $ 6,000.00 |
| FHB Swing Video Deposits | $ 252,482.00 | $ 243,888.23 | $ 318,475.29 | $ 308,457.69 |
| UHFCU Cash Deposits | $ 1,110.00 | $ 12,250.00 | $ 14,000.00 | $ 4,000.00 |
| Total Bank Deposits | $ 256,592.00 | $ 265,138.23 | $ 337,575.29 | $ 318,457.69 |
| Less: | | | | |
| Checks to Cash | $ (11,400.00) | $ - | $ - | $ - |
| Schedule C & E Gross Receipts | $ (94,110.00) | $(178,051.00) | $(301,439.00) | $(271,322.00) |
| Gross Wages | $ - | $ (2,000.00) | $ (24,000.00) | $ (18,000.00) |
| Other Income | $ - | $ (2,000.00) | $ - | $ (9,750.00) |
| Taxable Interest | $ (84.00) | $ (233.00) | $ - | $ (185.00) |
| Taxable Refunds | $ (497.00) | $ - | $ (355.00) | $ - |
| Unidentified Bank Deposits | $ 150,501.00 | $ 82,854.23 | $ 11,647.29 | $ 19,200.69 |

## 1999 UNIDENTIFIED BANK DEPOSITS

61.     In 1999, the Schedule of Total Bank Deposits showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had unidentified bank deposits of $150,501.00 which indicates an inherent appearance of income.

## 2000 UNIDENTIFIED BANK DEPOSITS

62.     In 2000, the Schedule of Total Bank Deposits showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had unidentified bank deposits of $82,854.23 which indicates an inherent appearance of income.

## 2001 UNIDENTIFIED BANK DEPOSITS

63.    In 2001, the Schedule of Total Bank Deposits showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had unidentified bank deposits of $11,647.29 which indicates an inherent appearance of income.

## 2002 UNIDENTIFIED BANK DEPOSITS

64.    In 2002, the Schedule of Total Bank Deposits showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had unidentified bank deposits of $19,200.69 which indicates an inherent appearance of income.

## SECOND INDICATION OF FRAUD

65.    Based on my experience and training, I know that BETTY YI HERNANDEZ and Kwang Sup SHIN having unidentified bank deposits of $150,501.00 in 1999, $82,854.23 in 2000, $11,647.29 in 2001 and $19,200.69 in 2002 was an indication of fraud and indicates an inherent appearance of income.

## STEP 4.  DETERMINING ADDITIONAL TAXABLE INCOME

## INDICATIONS OF FRAUD

66.    By January 2001, BETTY YI HERNANDEZ and Kwang Sup SHIN had acquired a net worth of $579,215.00 when having taxable income of ($22,622.00) in 1998, ($56,286.00) in 1999 and ($21,407.00) in 2000.

67.    Based on my experience and training, I know that BETTY YI HERNANDEZ having a net worth of $579,215.00 when having taxable income of ($22,622.00) in 1998, ($56,286.00) in 1999 and ($21,407.00) in 2000 was an indication of fraud and indicates an inherent appearance of income.

68.    According to the Schedule of Total Bank Deposits, BETTY YI HERNANDEZ and Kwang Sup SHIN having unidentified bank deposits of $150,501.00 in 1999, $82,854.23 in 2000, $11,647.29 in 2001 and $19,200.69 in 2002 indicates an inherent appearance of income.

69.    Based on my experience and training, I know that BETTY YI HERNANDEZ and Kwang Sup SHIN having unidentified bank deposits of $150,501.00 in 1999, $82,854.23 in 2000, $11,647.29 in 2001 and $19,200.69 in 2002 was an indication of fraud and indicates an inherent appearance of income.

## ADDITIONAL TAXABLE INCOME COMPUTATION

70.    Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the indications of fraud committed by BETTY YI HERNANDEZ and Kwang Sup SHIN, based on the foregoing facts and based on my experience and training, I conducted a financial investigation to determine if BETTY YI HERNANDEZ and Kwang Sup SHIN had any Additional Taxable Income in 1999, 2000, 2001, and 2002.

71.    This was done to determine how BETTY YI HERNANDEZ and Kwang Sup SHIN had acquired a net worth of $579,215.00 when having taxable income of ($22,622.00) in 1998, ($56,286.00) in 1999 and ($21,407.00) in 2000.

72.    This was done to determine if the unidentified bank deposits of $150,501.00 in 1999, $82,854.23 in 2000, $11,647.29 in 2001 and $19,200.69 in 2002 would result in Additional Taxable Income for BETTY YI HERNANDEZ and Kwang Sup SHIN.

## BANK DEPOSITS METHOD OF PROOF

73.    Based on my experience and training, I prepared the following Bank Deposits Method of Proof Schedule to determine if BETTY YI HERNANDEZ and Kwang Sup SHIN had any Additional Taxable Income in 1999, 2000, 2001, and 2002 because of unidentified bank deposits.

## BANK DEPOSITS METHOD OF PROOF SCHEDULE

| ITEMS | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| City Bank Deposits | $ 3,000.00 | $ 9,000.00 | $ 5,100.00 | $ 6,000.00 |
| FHB Swing Video Deposits | $ 252,482.00 | $ 243,888.23 | $ 318,475.29 | $ 308,457.69 |
| UHFCU Deposits | $ 1,110.00 | $ 12,250.00 | $ 14,000.00 | $ 4,000.00 |
| Cash Expenditures | $ 5,685.72 | $ 11,115.69 | $ 14,953.80 | $ 8,335.32 |
| Withheld Taxes | $ 6.00 | $ 219.00 | $ 14,953.80 | $ 8,335.32 |
| Checks to Cash | $ (11,400.00) | $ - | $ 2,343.00 | $ 1,210.00 |
| Total Funds Available | $ 250,883.72 | $ 276,472.92 | $ 354,872.09 | $ 328,003.01 |
| Less: | | | | |
| Cost of Goods Sold | $ (8,326.00) | $ - | $ (62,420.00) | $ (65,020.00) |
| Gross Income | $ 242,557.72 | $ 276,472.92 | $ 292,452.09 | $ 262,983.01 |
| Business Expenses | $ (63,179.00) | $(110,921.00) | $(157,669.00) | $(136,765.00) |
| Rental Expenses | $ (38,394.00) | $ (30,372.00) | $ (39,172.00) | $ (21,771.00) |
| Total Income | $ 140,984.72 | $ 135,179.92 | $ 95,611.09 | $ 104,447.01 |
| Less: | | | | |
| One Half Self Employment Tax | $ - | $ (2,497.00) | $ (4,309.00) | $ (4,913.00) |
| Self Employed Health Insurance | $ - | $ - | $ (4,220.00) | |
| Adjusted Gross Income | $ 140,984.72 | $ 132,682.92 | $ 87,082.09 | $ 99,534.01 |
| Less: | | | | |
| Itemized Deductions | $ (17,280.00) | $ (20,214.00) | $ (30,291.00) | $ (26,255.00) |
| Personal Exemptions | $ (5,500.00) | $ (5,600.00) | $ (5,800.00) | $ (6,000.00) |
| Corrected Taxable Income | $ 118,204.72 | $ 106,868.92 | $ 50,991.09 | $ 67,279.01 |
| Less: | | | | |
| Taxable Income Per Return | $ - | $ - | $ (24,491.00) | $ (22,246.00) |
| Additional Taxable Income | $ 118,204.72 | $ 106,868.92 | $ 26,500.09 | $ 45,033.01 |

## DRUG PROCEEDS IN 1999

74.    In 1999, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $118,204.72 and Additional Taxable Income of $118,204.72. In 1999, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $118,204.72 represents unidentified income.

75.    In 1999, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $118,204.72 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## DRUG PROCEEDS IN 2000

76.     In 2000, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $106,868.92 and Additional Taxable Income of $106,868.92.  In 2000, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $106,868.92 represents unidentified income.

77.     In 2000, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $106,868.92 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## DRUG PROCEEDS IN 2001

78.     In 2001, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $50,991.09 and Additional Taxable Income of $26,500.09.  In 2001, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $26,500.09 represents unidentified income.

79.     In 2001, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $26,500.09 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## DRUG PROCEEDS IN 2002

80.     In 2002, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $67,279.01 and Additional Taxable Income of $45,033.01.  In 2002, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $45,033.01 represents unidentified income.

81.     In 2002, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $45,033.01 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## STEP 5.  SWING VIDEO LLC AS A BUSINESS FRONT FOR DRUG ACTIVITY

82.    Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the indications of fraud committed by BETTY YI HERNANDEZ and Kwang Sup SHIN, based on the foregoing facts, and based on my experience and training, I conducted a financial investigation to determine if BETTY YI HERNANDEZ created and maintained Swing Video LLC as a business front where illegal activity could be conducted and where illegally acquired money could be blended in with legitimate ordinary appearing bank deposits.

83.    Based on my experience and training, the commingling of illegally acquired money with legitimate ordinary appearing bank deposits would make the illegally acquired money appear that it came from a legitimate income.

84.    Based on the following information, it is probable that BETTY YI HERNANDEZ created and maintained Swing Video LLC as a business front where illegal activity could be conducted and where illegally acquired money could be blended in with legitimate ordinary appearing bank deposits.

85.    Based on my experience and training, the commingling of illegally acquired money with legitimate ordinary appearing bank deposits would make the illegally acquired money appear that it came from a legitimate source of income.

### LEASE AGREEMENT

86.    On 02/23/1999, according RIALD records, RIALD is the owner of that certain real property and improvements located at 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.

87.    On 02/23/1999, according to RIALD records, RIALD as the Lessor and BETTY YI HERNANDEZ and Swing Video LLC, a Hawaii limited liability corporation as the Lessee, entered into a Lease Agreement for the use and occupancy of 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.

88.    On 02/23/1999, according to RIALD records, the Lease Agreement was for a term of five (5) years commencing on the 1st day of March 1999, to and including the 28th day of February 2004.

89.    On 02/23/1999, according to RIALD records, BETTY YI HERNANDEZ, Manager, Swing Video LLC signed the Lease agreement.

90.    On 02/23/1999, according to RIALD records, under the terms and conditions of the Lease agreement, Swing Video LLC was to occupy 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814, as an "ADULT VIDEO STORE" and for no other purposes.

## BUSINESS REGISTRATION

91.    On 03/01/1999, according to DCCA records, BETTY YI HERNANDEZ filed Articles of Organization for a Domestic Limited Liability Company called Swing Video LLC (hereinafter Swing Video LLC) located at 1340 Kapiolani Blvd., Unit 2, Honolulu, Hawaii 96814.  On 03/01/1999, according to DCCA records, BETTY YI HERNANDEZ was the only officer on record for Swing Video LLC.

## DRUG ACTIVITY IN 1999

92.    On 11/08/1999, according to RIALD records, RIALD notified Swing Video LLC of alleged illegal activity occurring at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.

93.    On 11/18/1999, according to RIALD records, the Honolulu Police Department (hereinafter HPD) executed a search warrant at 10:34 p.m. at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.  HPD arrested 1 adult male and 3 adult females on 14 offenses of drug, drug paraphernalia and outstanding warrants.  HPD recovered $750.00 U.S. currency, 10 glass pipes containing apparent rock cocaine residue, and 5 grams of apparent rock cocaine.

94.    On 12/09/1999, according to RIALD records, RIALD notified Swing Video LLC that RIALD was exercising its right to terminate the Lease Agreement because of illegal drug activity occurring at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.

95.    On 12/14/1999, according to RIALD records, Swing Video LLC attorney Mark S. Kawata notified RIALD that BETTY YI HERNANDEZ and her employees were not involved in any illegal activity that would result in a breach of the Lease Agreement.

## DRUG PROCEEDS IN 1999

96.    In 1999, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $118,204.72 and Additional Taxable Income of $118,204.72.

97.    In 1999, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $118,204.72 represents unidentified income.

98.    In 1999, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $118,204.72 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## DRUG ACTIVITY IN 2000

99.    On 01/29/2000, according to RIALD records, HPD executed a search warrant at 4:41 a.m. at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.  HPD arrested 1 adult male and 1 adult female on 9 offenses of drug, drug paraphernalia and outstanding warrants. HPD recovered 5 grams of apparent rock cocaine, 3 glass pipes containing residue, and several clear plastic packets of apparent rock cocaine.

100.    On 05/16/2000, according to RIALD records, HPD executed a search warrant at 11:35 p.m. at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.  HPD arrested 8 persons on 19 offenses of drug, drug paraphernalia and outstanding warrants.  HPD recovered 6 grams of apparent rock cocaine, $1,079.00 in U.S. Currency, numerous glass pipes and small amounts of apparent rock cocaine.

101.    On 08/11/2000, according to RIALD records, HPD executed a search warrant at 10:50 p.m. at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.  HPD arrested 1

adult male and 1 adult female on 4 offenses of drug and outstanding warrants. HPD recovered apparent rock cocaine and marijuana.

102.    On 08/22/2000, 09/26/2000, and 10/24/2000, according to RIALD records, the Ala Moana/Kakaako Neighborhood Board notified BETTY YI HERNANDEZ about the illegal drug activity at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.

## DRUG PROCEEDS IN 2000

103.    In 2000, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $106,868.92 and Additional Taxable Income of $106,868.92.

104.    In 2000, based upon the Bank Deposits Method of Proof, the Additional Taxable income of $106,868.92 represents unidentified income.

105.    In 2000, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $106,868.92 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## DRUG PROCEEDS IN 2001

106.    In 2001, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $50,991.09 and Additional Taxable Income of $26,500.09.

107.    In 2001, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $26,500.09 represents unidentified income.

108.    In 2001, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $26,500.09 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## DRUG ACTIVITY IN 2002

109.    On 05/30/2002, according to RIALD records, RIALD notified Swing Video LLC attorney Mark S. Kawata that 01/24/2002, a Swing Video LLC employee was arrested for selling drugs to an undercover HPD officer at Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.

## DRUG PROCEEDS IN 2002

110.    In 2002, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $67,279.01 and Additional Taxable Income of $45,033.01.

111.    In 2002, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $45,033.01 represents unidentified income.

112.    In 2002, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $45,033.01 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## STEP 6.  SWING VIDEO LLC LEASE RENT PAYMENTS FROM 1999 TO 2003

## LEASE RENT PAYMENTS

113.    Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the indications of fraud committed by BETTY YI HERNANDEZ and Kwang Sup SHIN, based on the foregoing facts, and based on my experience and training, I conducted a financial investigation to determine the lease rent payments that BETTY YI HERNANDEZ made that allowed Swing Video LLC to remain in business as an ADULT VIDEO STORE at 1340 Kapiolani Blvd., Ste. 2, Honolulu, Hawaii 96814.

114.    Based on my experience and training, it is probable that BETTY YI HERNANDEZ created and maintained Swing Video LLC as a business front where illegal activity could be conducted and

where illegally acquired money could be blended in with legitimate ordinary appearing bank deposits.

115.    Based on my experience and training, the commingling of illegally acquired money with legitimate ordinary appearing bank deposits would make illegally acquired money appear that it came from a legitimate source of income.

116.    Based on the following information, it is probable that BETTY YI HERNANDEZ used commingled funds (i.e. illegally acquired money blended in with legitimate ordinary appearing bank deposits) for lease rent payments.

117.    Based on my experience and training, these lease rent payments allowed Swing Video LLC to remain in business as an ADULT VIDEO STORE at 1340 Kapiolani Blvd., Ste. 2, Honolulu, Hawaii 96814.

## SECURITY DEPOSIT

118.    On 03/11/1999, according to RIALD records, BETTY YI HERNANDEZ paid $10,833.26 to Sofos Realty with FHB Check #455.  FHB Check #455 was drawn on BETTY YI HERNANDEZ dba Swing Video FHB Checking Account #47-019753.

## LEASE RENT PAID IN 1999

119.    In 1999, according to RIALD records, total lease rent payments were $60,564.59.  In 1999, according to RIALD records, lease rent payments were paid with checks drawn on BETTY YI HERNANDEZ dba FHB Swing Video Checking Account #47-019753 and BETTY YI HERNANDEZ UHFCU #85-013556.

## LEASE RENT PAID IN 2000

120.    In 2000, according to RIALD records, total lease rent payments were $89,719.24.  In 2000, according to RIALD records, lease rent payments were paid with checks drawn on BETTY YI HERNANDEZ dba FHB Swing Video Checking Account #47-019753.

## LEASE RENT PAID IN 2001

121.    In 2001, according to RIALD records, total lease rent payments were $89,719.24.  In 2001, according to RIALD records, lease rent payments were paid with checks drawn on BETTY YI HERNANDEZ dba FHB Swing Video Checking Account #47-019753.

## LEASE RENT PAID IN 2002

122.    In 2002, according to RIALD records, total lease rent payments were $88,008.92.  In 2002, according to RIALD records, lease rent payments were paid with checks drawn on BETTY YI HERNANDEZ dba FHB Swing Video Checking Account #47-019753.

## LEASE RENT PAID IN 2003

123.    In 2003, according to RIALD records, total lease rent payments were $85,206.09.  In 2003, according to RIALD records, lease rent payments were paid with checks drawn on BETTY YI HERNANDEZ dba FHB Swing Video Checking Account #47-019753.

## TOTAL LEASE RENT PAID

124.    From 1999 to 2003, according to RIALD records, a total of $412,380.52 in lease rent payments was received from BETTY YI HERNANDEZ and Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.

## REFUNDABLE SECURITY DEPOSIT

125.    According to RIALD records, BETTY YI HERNANDEZ is entitled to a refundable security deposit of $10,833.26 from RIALD for Swing Video LLC, 1340 Kapiolani Blvd., Ste. 102, Honolulu, Hawaii 96814.

## STEP 7.  DRUG PROCEEDS DEPOSITED IN AMOUNTS LESS THAN $10,000

126.    Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the indications of fraud committed by BETTY YI

HERNANDEZ and Kwang Sup SHIN, based on the foregoing facts and based on my experience and training, it is probable that BETTY YI HERNANDEZ created and maintained Swing Video LLC as a business front where illegal activity could be conducted and where illegally acquired money could be blended in with legitimate ordinary appearing bank deposits.

127.    Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the indications of fraud committed by BETTY YI HERNANDEZ and Kwang Sup SHIN, based on the foregoing facts and based on my experience and training, I conducted a financial investigation to determine if BETTY YI HERNANDEZ and Kwang Sup SHIN were depositing cash in amounts less than $10,000 to prevent banks from filing a Currency Transaction Report with the IRS.

128.    Based on the following information, it is probable that BETTY YI HERNANDEZ, and Kwang Sup SHIN deposited cash from drug dealers and drug users in amounts less than $10,000 to prevent banks from filing a Currency Transaction Report with the IRS.

129.    Based on the following information, it is probable that illegally acquired money was blended in with legitimate ordinary appearing bank deposits in FHB Swing Video Checking Account #47-019753 and FHB Swing Video LLC Checking Account #65-194899.

## FHB SWING VIDEO CHECKING ACCOUNT #47-019753

130.    132. On 03/02/1997, according to FHB records, BETTY YI HERNANDEZ, the sole proprietor of Swing Video, opened FHB Checking Account #47-019753 in the name of BETTY YI HERNANDEZ dba Swing Video, 35 North Hotel Street, Honolulu, Hawaii 96817.

131.    According to FHB employees and FHB records, BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM deposited cash and checks into FHB Swing Video Checking Account #47-019753.

## FHB SWING VIDEO LLC CHECKING ACCOUNT #65-194899

132.    On 11/08/1999, according to FHB records, BETTY YI HERNANDEZ, the President/Owner. of Swing Video, opened FHB Checking Account #65-194899 in the name of Swing Video LLC, 1340 Kapiolani Blvd., Unit 102, Honolulu, Hawaii.

133.    According to FHB employees and FHB records, BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM deposited cash and checks into FHB Swing Video LLC Checking Account #65-0194899.

## FHB CASH DEPOSITS BY BETTY YI HERNANDEZ ETAL

134.    According to FHB employees, BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM used FHB currency straps to bundle bills of the same denomination.

135.    According to FHB employees, BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM bundled $1 bills in stacks of $100.00, $5 bills in stacks of $500.00, $10 bills in stacks of $1,000.00 and $20 bills in stacks of $2,000.00.

136.    According to FHB employees, BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM deposited bundled bills into FHB Swing Video Checking Account #47-019753.

137.    According to FHB employees, BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM deposited bundled bills into FHB Swing Video LLC Checking Account #65-0194899.

## FHB CASH DEPOSITS IN 1999

138.    In 1999, FHB records showed that BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM managed to deposit a total of $124,209.27 in cash into FHB Swing Video Checking Account #47-019753.  This required a number of deposits, all made in amounts well under $10,000.

139.    In 1999, FHB records showed that the total amount of cash deposited into FHB Swing Video LLC Checking Account #65-194899 was Zero Dollars.

140.    In 1999, IRS records showed that no Currency Transaction Reports were filed for FHB Swing Video Checking Account #47-019753 and for FHB Swing Video LLC Checking Account #65-194899.

## DRUG PROCEEDS IN 1999

141.    In 1999, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $118,204.72 and Additional Taxable Income of $118,204.72.

142.    In 1999, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $118,204.72 represents unidentified income.

143.    In 1999, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $118,204.72 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## FHB CASH DEPOSITS IN 2000

144.    In 2000, FHB records showed that BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM managed to deposit a total of $178,711.00 in cash into FHB Swing Video Checking Account #47-019753.  This required a number of deposits, all made in amounts well under $10,000.

145.    In 2000, FHB records showed that BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM managed to deposit a total of $4,200.00 in cash into FHB Swing Video LLC Checking Account #65-194899.

146.    In 2000, IRS records showed that no Currency Transaction Reports were filed for FHB Swing Video Checking Account #47-019753 and for FHB Swing Video LLC Checking Account #65-194899.

### DRUG PROCEEDS IN 2000

147.    In 2000, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $106,868.92 and Additional Taxable Income of $106,868.92.

148.    In 2000, based upon the Bank Deposits Method of Proof, the Additional Taxable income of $106,868.92 represents unidentified income.

149.    In 2000, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $106,868.92 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

### FHB CASH DEPOSITS IN 2001

150.    In 2001, FHB records showed that BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM managed to deposit a total of $223,117.65 in cash into FHB Swing Video Checking Account #47-019753.  This required a number of deposits, all made in amounts well under $10,000.

151.    In 2001, FHB records showed that BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM managed to deposit a total of $31,500.00 in cash into FHB Swing Video LLC Checking Account #65-194899.  This required a number of deposits, all made in amounts well under $10,000.

152.    In 2001, IRS records showed that no Currency Transaction Reports were filed for FHB Swing Video Checking Account #47-019753 and for FHB Swing Video LLC Checking Account #65-194899.

### DRUG PROCEEDS IN 2001

153.    In 2001, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $50,991.09 and Additional Taxable Income of $26,500.09.

154.    In 2001, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $26,500.09 represents unidentified income.

155.    In 2001, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $26,500.09 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

### FHB CASH DEPOSITS IN 2002

156.    In 2002, FHB records showed that BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM managed to deposit a total of $249,226.00 in cash into FHB Swing Video Checking Account #47-019753.  This required a number of deposits, all made in amounts well under $10,000.

157.    In 2002, FHB records showed that BETTY YI HERNANDEZ, Kwang Sup SHIN and Nho Boon KIM managed to deposit a total of $13,000 in cash into FHB Swing Video LLC Checking Account #65-194899.  This required a number of deposits, all made in amounts well under $10,000.

158.    In 2002, IRS records showed that no Currency Transaction Reports were filed for FHB Swing Video Checking Account #47-019753 and for FHB Swing Video LLC Checking Account #65-194899.

### DRUG PROCEEDS IN 2002

159.    In 2002, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $67,279.01 and Additional Taxable Income of $45,033.01.

160.    In 2002, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $45,033.01 represents unidentified income.

161.    In 2002, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $45,033.01 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## STEP 8.  AVOIDING CURRENCY TRANSACTION REPORTS

162.    Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the indications of fraud committed by BETTY YI HERNANDEZ and Kwang Sup SHIN, based on the foregoing facts and based on my experience and training, it is probable that BETTY YI HERNANDEZ, and Kwang Sup SHIN deposited cash from drug dealers and drug users in amounts less than $10,000 to prevent banks from filing a Currency Transaction Report with the IRS.

163.    Based on the following information, it is probable that illegally acquired money was blended in with legitimate ordinary appearing bank deposits in FHB Swing Video Checking Account #47-019753 and FHB Swing Video LLC Checking Account #65-194899 in amounts less than $10,000 to prevent FHB from filing a Currency Transaction Report with the IRS.

## STRUCTURING CASH DEPOSITS AT FHB

164.    On 07/08/2003, according to FHB records, Kwang Sup SHIN deposited cash in amounts less than $10,000 to prevent FHB from filing a Currency Transaction Report with the IRS.

165.    On 07/08/2003, according to FHB records, Kwang Sup SHIN intended to make cash deposits totaling $14,000.00 into FHB Swing Video Business Checking Account #47-019753 and FHB Swing Video LLC Business Checking Account #65-194899.

166.    On 07/08/2003, according to FHB records, Kwang Sup SHIN deposited $6,000.00 in cash in $20 bills into FHB Swing Video LLC Business Checking Account #65-194899.

167.    On 07/08/2003, according to FHB records, Kwang Sup SHIN was going to deposit $8,000.00 in cash into FHB Swing Video Business Checking Account #47-019753.

168.    On 07/08/2003, according to FHB employees, Kwang Sup SHIN learned that FHB would file a Currency Transaction Report (hereinafter CTR) for cash transactions of $10,000 or more.

169.    On 07/08/2003, according to FHB employees, after contacting an unidentified individual by cellular telephone, Kwang Sup SHIN reduced the amount of his original intended $8,000.00 cash deposit into FHB Swing Video Business Checking Account #47-019753.

170.    On 07/08/2003, according to FHB records, Kwang Sup SHIN reduced the amount of his original intended $8,000.00 cash deposit into FHB Swing Video Business Checking Account #47-019753.

171.    On 07/08/2003, according to FHB records, Kwang Sup SHIN deposited $3,000.00 in cash in $1 bills into FHB Swing Video Business Checking Account #47-019753.

172.    IRS records showed that no Currency Transaction Reports were filed for the cash deposits that were made into FHB Swing Video Checking Account #47-019753 and for FHB Swing Video LLC Checking Account #65-194899 by Kwang Sup SHIN on 07/08/2003.

## STEP 9.  BANK ACCOUNTS AT OTHER FINANCIAL INSTITUTIONS

173.    Based on the information provided by the Honolulu DEA Task Force on BETTY YI HERNANDEZ and Swing Video LLC, based on the indications of fraud committed by BETTY YI HERNANDEZ and Kwang Sup SHIN, based on the foregoing facts and based on my experience and training, I conducted a financial investigation to determine if BETTY YI HERNANDEZ used bank accounts other than FHB Swing Video Checking Account #47-019753 and FHB Swing Video LLC Checking Account #65-194899 to deposit cash from drug dealers and drug users, in amounts less than $10,000, to prevent banks from filing a Currency Transaction Report with the IRS.

## CITY BANK SAVINGS ACCOUNT #236322420

## CITY BANK CASH DEPOSITS IN 1999

174.    Based on the following information, it is probable that illegally acquired money was blended in with legitimate ordinary appearing bank deposits in CB Savings Account #236322420 in amounts less than $10,000 to prevent CB from filing a Currency Transaction Report with the IRS.

175.    On 01/18/1999, according to CB records, BETTY YI HERNANDEZ had a balance of $2,183.05 in CB Savings Account #236322420.

176.    In 1999, Swing Video LLC was the primary source of income for BETTY YI HERNANDEZ.

177.    In 1999, the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of ($56,286.00).

178.    In 1999, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $118,204.72 and Additional Taxable Income of $118,204.72.

179.    In 1999, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $118,204.72 represents unidentified income.

180.    In 1999, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $118,204.72 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

181.    In 1999, CB records showed that BETTY YI HERNANDEZ managed to deposit a total of $3,000.00 in cash into CB #236322420.

182.    In 1999, based upon the information of the Honolulu DEA Task Force investigation, the $3,000.00 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## CITY BANK CASH DEPOSITS IN 2000

183.   In 2000, Swing Video LLC was the primary source of income for BETTY YI HERNANDEZ.

184.   In 2000, the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of ($21,407.00).

185.   In 2000, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $106,868.92 and Additional Taxable Income of $106,868.92.

186.   In 2000, based upon the Bank Deposits Method of Proof, the Additional Taxable income of $106,868.92 represents unidentified income.

187.   In 2000, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $106,868.92 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

188.   In 2000, CB records showed that BETTY YI HERNANDEZ managed to deposit a total of $9,000.00 in cash into CB #236322420.

189.   In 2000, based upon the information of the Honolulu DEA Task Force investigation, the $9,000.00 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## CITY BANK CASH DEPOSITS IN 2001

190.   In 2001, Swing Video LLC was the primary source of income for BETTY YI HERNANDEZ.

191.   In 2001, the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of $24,491.00.

192.    In 2001, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $50,991.09 and Additional Taxable Income of $26,500.09.

193.    In 2001, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $26,500.09 represents unidentified income.

194.    In 2001, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $26,500.09 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

195.    In 2001, CB records showed that BETTY YI HERNANDEZ managed to deposit a total of $5,100.00 in cash into CB #236322420.

196.    In 2001, based upon the information of the Honolulu DEA Task Force investigation, the $5,100.00 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## CITY BANK CASH DEPOSITS IN 2002

197.    In 2002, Swing Video LLC was the primary source of income for BETTY YI HERNANDEZ.

198.    In 2002, the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of $22,246.00.

199.    In 2002, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $67,279.01 and Additional Taxable Income of $45,033.01.

200.    In 2002, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $45,033.01 represents unidentified income.

201.    In 2002, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $45,033.01 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

202.    In 2002, CB records showed that BETTY YI HERNANDEZ managed to deposit a total of $6,000.00 in cash into CB #236322420.

203.    In 2002, based upon the information of the Honolulu DEA Task Force investigation, the $6,000.00 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## UNIVERSITY OF HAWAII FCU ACCOUNT #37961

### UHFCU CASH DEPOSITS IN 1999

204.    Based on the following information, it is probable that illegally acquired money was blended in with legitimate ordinary appearing bank deposits in UHFCU Prime Share Account #37961, in amounts less than $10,000 to prevent UHFCU bank from filing a Currency Transaction Report with the IRS.

205.    On 06/17/1999, according to UHFCU records, BETTY YI HERNANDEZ opened UHFCU Prime Share Account #37961 with a deposit of $110.14.

206.    In 1999, Swing Video LLC was the primary source of income for BETTY YI HERNANDEZ.

207.    In 1999, the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of ($56,286.00).

208.    In 1999, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $118,204.72 and Additional Taxable Income of $118,204.72.

209.    In 1999, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $118,204.72 represents unidentified income.

210.    In 1999, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $118,204.72 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

211.    In 1999, UHFCU records showed that BETTY YI HERNANDEZ managed to deposit a total of $1,110.00 in cash into UHFCU Prime Share Account #37961.

212.    In 1999, based upon the information of the Honolulu DEA Task Force investigation, the $1,110.00 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## UHFCU CASH DEPOSITS IN 2000

212.    In 2000, Swing Video LLC was the primary source of income for BETTY YI HERNANDEZ.

213.    In 2000, the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of ($21,407.00).

214.    In 2000, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $106,868.92 and Additional Taxable Income of $106,868.92.

215.    In 2000, based upon the Bank Deposits Method of Proof, the Additional Taxable income of $106,868.92 represents unidentified income.

216.    In 2000, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $106,868.92 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

217.    In 2000, UHFCU records showed that BETTY YI HERNANDEZ managed to deposit a total of $12,250.00 in cash into UHFCU Prime Share Account #37961.

218.   In 2000, based upon the information of the Honolulu DEA Task Force investigation, the $12,250.00 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

## UHFCU CASH DEPOSITS IN 2001

219.   In 2001, Swing Video LLC was the primary source of income for BETTY YI HERNANDEZ.

220.   In 2001, the Schedule of Reported Taxable Income showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had taxable income of $24,491.00.

221.   In 2001, the Bank Deposits Method of Proof showed that BETTY YI HERNANDEZ and Kwang Sup SHIN had Corrected Taxable Income of $50,991.09 and Additional Taxable Income of $26,500.09.

222.   In 2001, based upon the Bank Deposits Method of Proof, the Additional Taxable Income of $26,500.09 represents unidentified income.

223.   In 2001, based upon the information of the Honolulu DEA Task Force investigation, the Additional Taxable Income of $26,500.09 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.

224.   In 2001, UHFCU records showed that BETTY YI HERNANDEZ managed to deposit a total of $14,000.00 in cash into UHFCU Prime Share Account #37961.

225.   In 2001, based upon the information of the Honolulu DEA Task Force investigation, the $14,000.00 represents an inherent appearance of income that BETTY YI HERNANDEZ likely received from drug users and drug dealers.